The Honorable John A. Riggs, IV State Senator P.O. Box 1399 Little Rock, Arkansas 72203-1399
The Honorable James B. Argue State Senator 5300 Evergreen Drive Little Rock, Arkansas 72205
The Honorable William L. "Bill" Walker, Jr. State Senator P.O. Box 1609 Little Rock, Arkansas 72203-1609
Dear Senators Riggs, Argue and Walker:
I am writing in response to your joint request for an opinion concerning the relationship between Amendments 74 and 78 of the Arkansas Constitution. Specifically, you note that Article 14, § 2 of our Constitution provides that:
 No money or property belonging to the public school fund, or to this State for the benefit of schools or universities, shall ever be used for any other than for the respective purposes to which it belongs.
You then note that Amendment 74 (Section (b)(1)) establishes a "uniform rate of ad valorem property tax of twenty-five mills to be levied on the assessed value of all taxable real, personal and utility property in the state to be used solely for maintenance and operation of the schools." Section (b)(3) of that same Amendment, you note, requires that "the net revenues from the uniform rate of tax shall be remitted to the State Treasurer and distributed by the state to the school districts as provided by law." Section (b)(3) also requires that "[t]he revenue so distributed shall be used by the school districts solely for the maintenance and operation of schools."
Amendment 78, as you state, authorizes the General Assembly to provide that the ad valorem taxes levied by any taxing unit in which is located all or part of a redevelopment district may be divided so that all or part of the ad valorem taxes levied against any increase in the assessed value of property in the redevelopment district, excluding ad valorem taxes for debt service, may be used to pay any indebtedness incurred for the redevelopment project. You note that Amendment 78 expressly protects debt service mills from use by a redevelopment district, but does not expressly address the twenty-five mills protected by Amendment 74 and Article 14.
You request my opinion "as to whether any part of the twenty-five mills established by Amendment 74 as the uniform rate of ad valorem property tax to be used solely for the maintenance and operation of the schools may legally be diverted to support a redevelopment district."
RESPONSE
The answer to your question is not entirely clear. Although Amendment 78 was enacted after Amendment 74 and contains a "general repealer" clause, a question may arise as to whether the uniform rate of tax falls within the language used in Amendment 78 or its enabling legislation. Amendment 78 authorizes the General Assembly to divide "all" or part of the ad valorem taxes levied by "any taxing unit" which are attributable to the increase in assessed value of property in redevelopment districts. It might be contended, although there is definite room for disagreement, that the tax levied by Amendment 74 is levied by the state itself (the electors of the whole state) and not by a "taxing unit" for purposes of this provision. In fact, the General Assembly has not included the "state" in the definition of "taxing unit" in the applicable enabling legislation. The more pertinent parts of the enabling legislation, however, do not rely on the definition of "taxing unit" and appear to refer comprehensively to all school taxes. The issue also turns upon whether the uniform rate of twenty-five mills is included in the definition of "total ad valorem rate" for purposes of that legislation and the calculations that take place under it. In my opinion, therefore, it is unclear whether Amendment 78 and its enabling legislation authorize the diversion of the uniform rate of tax as it applies to the increase in assessed value in a redevelopment district. Certainly, neither Amendment 78 nor its enabling legislation mentions the uniform rate. In my opinion, however, the General Assembly is invested with significant discretion under Amendment 78 and may amend the statutory scheme to clarify the matter as it sees fit.[1]
The Applicable Law
A brief explanation of Amendment 74 and Amendment 78 will be helpful in providing a backdrop for addressing your question.
Amendment 74, which was of course adopted before Amendment 78,[2]
levies the twenty-five mill uniform rate. In addition to the portions of the Amendment that you have quoted, the Amendment states that the "uniform rate of tax shall not be an additional levy for maintenance and operation of the schools but shall replace a portion of the existing rate of tax levied by each school district. . . ." Amendment 74, (b)(2). The uniform rate is to be "assessed and collected in the same manner as other school property taxes, but the net revenues from the uniform rate of tax shall be remitted to the State Treasurer and distributed by the state to the school districts as provided by law." Amendment 74 (b)(3). This subsection also states that "[n]o portion of the revenues from the uniform rate of tax shall be retained by the state." The enabling legislation for Amendment 74 currently provides for the distribution of the uniform rate by the state "to each local school district from which the revenues were derived." A.C.A. § 26-80-101(c)(1) (Supp. 2001). Under current law, therefore, money arising from the uniform rate is returned by the state to the individual district from which it arose.
The uniform rate may not be increased or decreased by the General Assembly without a vote of the state's electors. See Amendment 74 (b)(4). Amendment 74 authorizes individual school districts to levy ad valorem property taxes above the uniform rate by submitting a rate of tax at the annual school election for approval of the voters. Amendment 74(c)(1). As a matter of practice, however, it is my understanding that the rate submitted to the electors generally includes the twenty-five mill uniform rate required by Amendment 74 and the total amount of tax is therefore approved by the voters at the annual school election.
The second amendment pertinent to your question is Amendment 78. It contains two separate sections, one authorizing the creation of "redevelopment districts" and the other authorizing municipalities and counties to engage in certain short-term financing obligations. The relevant section for purposes of your question is Section 1, regarding redevelopment districts.
The mechanism used to fund such redevelopment districts has sometimes been called "tax increment financing" or "TIF." Although the people of Arkansas have just recently authorized the creation of such districts through a constitutional amendment, a former statutory subchapter purported to authorize their creation, but was of doubtful constitutionality. See Act 716 of 1981, formerly codified at A.C.A. §14-168-201 to -220 (repealed by Act 1197 of 2001, the enabling legislation for Amendment 78) and Op. Att'y Gen. 89-264.[3] In Opinion89-264, one of my predecessors had occasion to discuss the constitutionality of that subchapter and to outline the general operation of such districts:
 Act 716 of 1981 authorizes a procedure whereby a municipality may establish a redevelopment district to construct public improvements and alleviate "blighted areas." The act provides for the establishment of the district and the issuance of bonds to finance any public improvements to be undertaken. The bonds are funded by the tax revenues which are generated from the increased tax base. Specifically, the act uses a formula for calculating what portion of the general ad valorem tax revenues should go to fund the district's improvements. The act authorizes the setting of a "tax incremental base" which is the aggregate equalized value of all taxable property within the redevelopment district just before it is created. The crucial aspect of the act is that it channels the taxes derived from all increases in the tax incremental base after creation of the district to a special fund to retire the bonds issued to fund the redevelopment project.
* * *
 [G]eneral ad valorem taxes collected on real property, which are attributable to any increase over the tax incremental base, are targeted to repay the bonds funding the district. These taxes, at least those levied by school districts, would otherwise be used to support the public schools. . . . Your question is whether this scenario violates Art. 14, §§ 2 and 3 of the Arkansas Constitution, (as amended by Amendments 11 and 40). . . .
Former Attorney General Steve Clark, relying on a case from the State of Kentucky, opined that Act 716 of 1981 was "constitutionally suspect," stating:
 The tax dollars raised by the school districts from the increases in assessed value are, under our constitution, to be used for school purposes alone. The fact is that these taxes, even if it is admitted that they would not exist if it were not for the establishment of the district [footnote omitted] are, under the act, to be allocated to retire the bonds issued in an effort to alleviate" blighted areas." This, in my opinion, simply cannot be construed as a school purpose. These taxes are levied and collected under the school millage, and thus cannot be used for other than school purposes. In the words of the Kentucky Supreme Court,[4] this is a "stubborn fact" of our Constitution.
The people of Arkansas, however, have now constitutionalized the authority for such redevelopment districts. See Amendment 78, § 1. The General Assembly has adopted enabling legislation under Amendment 78 § 1(g) to place this authority into effect. See A.C.A. § 14-168-301 to -322 (Supp. 2001). The relevant portion of Amendment 78 is Section 1 (d), which provides as follows:
 (d) The General Assembly may provide that the ad valorem taxes levied by any taxing unit, in which is located all or part of an area included in a redevelopment district, may be divided so that all or part of the ad valorem taxes levied against any increase in the assessed value of property in the area obtaining after the effective date of the ordinance approving the redevelopment plan for the district shall be used to pay any indebtedness incurred for the redevelopment project; provided, however, there shall be excluded from the division all ad valorem taxes for debt service approved by voters in a taxing unit prior to the effective date of this amendment. [Emphasis added.]
Amendment 78 also provides in subsection (f) that "[a]ny provision of the Constitution of the State of Arkansas in conflict with this section is repealed insofar as it is in conflict with the amendment." Subsection (g) provides that "[t]he General Assembly shall provide for the implementation of this section by law."
The General Assembly adopted Act 1197 of 2001 in the most recent legislative session to implement the provisions of Amendment 78. The pertinent statute is A.C.A. § 14-168-312 (Supp. 2001), which sets out the calculation and division of tax moneys in a redevelopment district. It provides in pertinent part as follows:
 (a) For so long as the redevelopment district exists, the tax assessor shall divide the ad valorem tax revenue collected with respect to taxable property in the district, as follows:
(1) The assessor shall determine for each tax year:
 (A) The amount of total ad valorem tax revenue which should be generated by multiplying the total ad valorem rate times the current value;
 (B) The amount of ad valorem tax revenue which should be generated by multiplying the applicable ad valorem rate times the base value;
 (C) The amount of ad valorem tax revenue which should be generated by multiplying the debt service ad valorem rate times the current value; and
 (D) The amount of ad valorem revenue which should be generated by multiplying the applicable ad valorem rate times the incremental value.
 (2) The assessor shall determine from the calculations set forth in subdivision (a)(1) of this section the percentage share of total ad valorem revenue for each according to subdivisions (a)(1)(B)-(D) of this section, by dividing each of such amounts by the total ad valorem revenue figure determined by the calculation in subdivision (a)(1)(A)
of this section; and
 (3) On each date on which ad valorem tax revenue is to be distributed to taxing units, such revenue shall be distributed by:
 (A) Applying the percentage share determined according to subdivision (a)(1)(B) of this section to the revenues received and distributing such share to the taxing entities entitled to such distribution pursuant to current law;
 (B) Applying the percentage share determined according to subdivision (a)(1)(C) of this section to the revenues received and distributing such share to the taxing entities entitled to such distribution by reason of having bonds outstanding; and
 (C) Applying the percentage share determined according to subdivision (a)(1)(D) of this section to the revenues received and distributing such share to the special fund of the redevelopment district.
 (b) In each year for which there is a positive tax increment, the county treasurer shall remit to the special fund of the redevelopment district that portion of the ad valorem taxes that consist of the tax increment. [Emphasis added.]
Some of the emphasized terms are defined at A.C.A. § 14-168-301 (Supp. 2001). The "total ad valorem rate" is defined as meaning the "totalmillage rate of all county, city, school, or other local general propertytaxes levied on all taxable property within a redevelopment district in ayear." A.C.A. § 14-168-301(17) (emphasis added). "Current value" is defined as "the assessed value of all property within a redevelopment district subject to ad valorem taxation, as of the most recent assessment after the formation of the redevelopment district." A.C.A. §14-168-301(4). "Applicable ad valorem rate" means "the total ad valorem rate less the debt service ad valorem rate." A.C.A. § 14-168-301(1). "Base value" means "the assessed value of all property within a redevelopment district subject to ad valorem taxation, as of the most recent assessment preceding the formation of the redevelopment district." A.C.A. § 14-168-301(2). "Debt service ad valorem rate" means that portion of the total ad valorem rate that has been, at January 1, 2001, pledged to the payment of debt service on bonds issued by any taxing unit in which all or any part of the redevelopment district is located." A.C.A. § 14-168-301(5). "Incremental value" means the difference between the base value and the current value. A.C.A. § 14-168-301(6)(A). "Taxingunit" means "any city, county, school district, or community collegedistrict." A.C.A. § 14-168-301(16) (emphasis added).
Analysis
With regard to construction of Amendment 78, the same rules of construction and interpretation governing repeals and amendments of statutes apply to repeals and amendments of constitutional provisions.See Ward School Bus Manufacturing v. Fowler, 261 Ark. 100, 547 S.W.2d 394
(1977) (Fogleman, J. concurring) and cases cited therein. Section 1 (f) of Amendment 78 contains a so-called "general repealer" clause, stating that: "Any provision of the Constitution of Arkansas in conflict with this section is repealed insofar as it is in conflict with this amendment." A general repealer of this nature does not expressly mention any provisions to be repealed. It has been held that such a "general repealer" can repeal conflicting laws, but the repeal is one "by implication." Shelton v. Fiser, 340 Ark. 89, 8 S.W.3d 557 (2000). Case are legion in Arkansas for the proposition that repeals by implication are not favored and are never allowed except where there is such invincible repugnancy between the former and latter provisions that both cannot stand together. Donoho v. Donoho, 318 Ark. 637, 887 S.W.2d 290
(1994).
Amendments of a constitutional provision by implication are no more favored than are repeals. Rankin v. Jones, 224 Ark. 1001, 278 S.W.2d 646
(1955). In addition, with regard to constitutional provisions, it is the duty of the court to construe constitutional sections so that the instrument as a whole is harmonious if it is possible to do so. Chesshirv. Copeland, 182 Ark. 425, 32 S.W.2d 301 (1930). A constitutional amendment displaces only such provisions of the existing constitution as are found to be inconsistent with it. Hodges v. Dawdy, 104 Ark. 583,149 S.W. 656 (1912). No interpretation of a constitutional amendment should be allowed which would conflict with any other provision of the constitution unless it is absolutely necessary to give effect to the amendment. State v. Donaghey, 106 Ark. 56, 152 S.W. 746 (1912).
Under Amendment 78 the General Assembly is authorized to divert "all" or a part of the ad valorem taxes levied by any "taxing unit" to fund the redevelopment district. Clearly, a school district is a "taxing unit" for purposes of this provision. Cf. Frank v. Barker, 341 Ark. 577,20 S.W.3d 293 (2000) (school district was clearly a "taxing unit" for purposes of Amendment 59 even though its territory spanned two or more counties). The enabling legislation for Amendment 78, passed as Act 1197 of 2001 and now codified at A.C.A. §§ 14-168-301 to 322 (Supp. 2001), specifically defines the term "taxing unit" as including school districts.See A.C.A. § 14-168-301 (16). In my opinion, therefore, the enabling legislation clearly authorizes the diversion of some school tax revenues to support a redevelopment district. There is no question, in my opinion, that Amendment 78 was intended to supersede the provisions of Arkansas Constitution, art. 14, § 2 to the contrary. In my opinion, in light of the history of redevelopment financing laws in Arkansas and their dubious constitutionality, as expressed in Op. Att'y Gen 89-264, the general repealer clause of Amendment 78 was intended, at least in part, to overrule any conflict with provisions guaranteeing that school taxes only be used for school purposes. It was necessary to pass a constitutional amendment to authorize such redevelopment districts for the primary reason that existing restrictions on the expenditure of school revenues prevented the statutory creation of such districts. See again, Op. Att'y Gen. 89-264.
Your specific question, however, pertains to the uniform rate of tax, which is at least somewhat distinct from ordinary school millages. Does Amendment 78, to the extent required to further its purposes, supersede the guarantees of Amendment 74 that the uniform rate shall not be used for any other than school purposes? It is necessary to scrutinize both Amendment 78 and its current implementing legislation to determine the answer to this question. Amendment 78 grants substantial discretion to the General Assembly to implement its provisions.
Again, Amendment 78 authorizes the General Assembly to divide certain ad valorem taxes "levied by any taxing unit" for the purpose of supporting a redevelopment district. A question might arise as to whether the uniform rate of tax imposed by Amendment 74 is in fact an ad valorem tax "levied" by a "taxing unit" or whether it is actually a tax levied by the state as a whole (by the state's electors), and thus perhaps not by a "taxing unit" within the contemplation of Amendment 78. It has been stated with reference to taxation that the word "levy" has various meanings and must be determined in its context and it may be used in reference to either the legislative or administrative function of taxation. See e.g., AlphaBeta Acme Markets, Inc. v. City of Whittier, 68 Cal. Rptr. 327,262 Cal.App.2d 16 (1968); Walker v. Board of Assessors of Nassau County,480 N.Y.S.2d 933, 103 A.D.2d 580, rev'd 496 N.Y.S.2d 419, 66 N.Y.2d 702, 487 N.W.2d 276 (1984) and Southern Ry. Co. v. Kay, 62 S.C. 28, 39 S.E. 785
(1901), overruled to the extent of any conflict with Weaver v. RecreationDistrict, 328 S.C. 83, 492 S.E.2d 79 (1997). In the most recent Arkansas case construing the term, it was held to mean "to impose a tax under authority of law." Price v. Drainage District No. 17, 302 Ark. 64,787 S.W.2d 660 (1990). It has also been stated, however, that in its proper or strict sense, the word "levy" means formal and official legislative action whereby it is determined and declared that a tax of a certain amount, or of certain percentage on value, shall be imposed on persons and property subject thereto. State ex rel. Indus. Services Contractors,Inc. v. County Commission of Johnson County, 918 S.W.2d 252 (Mo. 1996).See also, Metropolitan Dade County v. Golden Nugget Group, 448 So.2d 515
(Fla.App. 1984), approved 464 So.2d 535 (1985); Hanek v. Cities ofClairton, 24 Pa. Cmwlth. 69, 354 A.2d 35 (1976), recognized as being superseded by statute in School District of Pittsburg v. City ofPittsburg, 66 Pa. Cmwlth. 238, 443 A.2d 1206 (1982); Carkonen v.Williams, 76 Wash.2d 617, 458 P.2d 280 (1969); Olson v. Oklahoma TaxCommission, 198 Okla. 607, 180 P.2d 622 (1947); City of Plankinton v.Kieffer, 70 S.D. 329, 17 N.W.2d 494 (1945); City of Richmond v. Eubank,179 Va. 70, 18 S.E.2d 397 (1942); Protest of First National Bank,136 Okla. 141, 276 P. 766 (1929); Atlantic Coast Line R. Co. v. Amos,94 Fla. 588, 115 So. 315 (1927); State v. City Council of Minneapolis,161 Minn. 103, 200 N.W. 932 (1924); People v. Illinois Cent. R. Co.267 Ill. 469, 108 N.E. 706 (1915); and School District No. 127 of RenoCounty v. School District No. 45 of Reno County, 80 Kan. 641, 103 P. 126
(1909). See also Black's Law Dictionary, 5th Ed (1979) at 816 (defining "levy" as "the exercise of legislative function, whether state or local, determining that a tax shall be imposed and fixing amount, purpose and subject of exaction").
The uniform rate of taxation of twenty-five mills was "levied" by the state as a whole in the sense that it was imposed by the electors of the entire state under Amendment 74, but the local electors also typically approve the rate in a local election.[5] It is thereafter "assessed and collected in the same manner as other school property taxes. . . ." Given the various meanings of the word "levy" and the fact that the uniform rate of tax is authorized by Amendment 74 as well as in most cases by the voters of each school district, it is difficult to state whether it is a tax "levied" by the state as opposed to a school district for purposes of Amendment 78.
If the uniform rate is "levied" by the state, a question arises as to whether the "state" or its collective voters comprise a "taxing unit" within the contemplation of Amendment 78 such that its revenues may be "divided." The common meaning of the term "unit" is a "single thing or person or group that is a constituent of a whole." Webster's Seventh NewCollegiate Dictionary (1972) at 970. Ordinarily, therefore, the state itself would not be thought of as a taxing "unit" with reference to state or local taxation. It is more commonly thought of as the "whole" for these purposes. But cf. Board of Commissioners of Shawnee County v.Brookover, 198 Kan. 70, 422 P.2d 906 (1967) (the state as a whole comprises a "taxing unit" for the purpose of levy and collection of state general taxes).
The questions, therefore, of whether the "uniform rate" of tax is a tax levied by the state, or by the local school district electors and whether, in the former case, the state is included in the meaning of the term "taxing unit" for purposes of Amendment 78, are questions amenable to a fair debate. I cannot predict with any certainty how four of the seven members of the Arkansas Supreme Court would determine the issue. I cannot opine conclusively, therefore, whether Amendment 78 itself
authorizes the General Assembly to divert the uniform rate of tax to support redevelopment districts. The Amendment does not mention or take account of the uniform rate and the general language used is ambiguous on the question.
Again, however, Amendment 78 grants the General Assembly substantial discretion in implementing its provisions. If Amendment 74 levies a state, rather than a local tax, it might be argued that the General Assembly has not provided for the uniform rate's inclusion in the pertinent calculation because the "state" is not defined in Amendment 78's enabling legislation as a "taxing unit." See A.C.A. § 14-168-301(16). The problem with this argument (in addition to the initial hurdle of establishing the uniform rate as a state tax) is that the words "taxing unit" are not used in the definition of "total ad valorem rate" or in that portion of the applicable statute requiring calculation and distribution of the funds.[6]
For purposes of the enabling legislation, the important part of the calculation is the definition of the "total ad valorem rate" and the question is whether this rate includes the uniform rate of twenty-five mills imposed by Amendment 74.[7] The "total ad valorem rate" is used to define several of the other components and to reach the "total ad valorem revenue figure" by which all other components of the calculation are divided.
As noted above, the "total ad valorem rate" is defined as including "the total millage rate of all county, city, school, or other local general property taxes. . . ." There might be room for an argument, therefore, that this definition excludes the taxes levied by Amendment 74 based on the assertion that Amendment 74 does not levy a "local general property tax." (Emphasis added). Although the uniform rate may indeed be characterized as a "school . . . tax" it may not be as easily designated a "local" one. On the other hand, it may be asserted that Amendment 78 and its enabling legislation refer comprehensively to "all" ad valorem taxes and to the "total millage rate" of school districts, thus evidencing an intention to include all school taxes, including the uniform rate of tax.
Again, I cannot provide a definitive answer to the question. I must note, however, that Amendment 78 invests the General Assembly with significant discretion to adopt enabling legislation and provides that it may authorize the division of "all" or "part" of ad valorem taxes in a redevelopment district. The General Assembly is invested with discretion as to the appropriate legislative scheme, but has simply not spoken unequivocally in the current legislation.
As a final note, I would be remiss not to point out several other considerations that may impact your question. I have addressed your question above only with reference to the relationship between Amendments 74, 78 and relevant enabling legislation, under established rules of statutory and constitutional construction. I have not undertaken in this opinion any discussion of extraneous constitutional provisions or imperatives that might eventually affect the outcome of your question, were it presented to a court. For example, you have not inquired, and I express no opinion on, how your question may be impacted by two separate pending lawsuits involving the constitutional obligations of the State with regard to school funding. See Lake View School District No. 25 ofPhillips County v. Mike Huckabee, et al., (Arkansas Supreme Court No. 01-836) (the "Lake View litigation"); and Little Rock School District v.Pulaski County Special School District No. 1 et al., (LR-C-82-866 (E.D. Ark. W. Div.)) (the "Little Rock desegregation case"). The impact of a "TIF" district with reference to these matters would have to be evaluated with reference to a particular redevelopment district and with access to all the surrounding facts. This is not possible in the limited format of an Attorney General opinion.
In addition, I express no opinion on other constitutional or statutory limitations that may impose practical limitations on the feasibility and funding of "TIF" districts. See for example, Amendment 79, § 1 (adopted at the same election and bearing the same effective date as Amendment 78, which caps and in some cases freezes the increase in assessment values on existing property for ad valorem tax purposes). See also
A.C.A. § 26-26-1308 (Supp. 2001) (prohibiting the assessment of taxes on values determined by a countywide reappraisal until all property in the county has been reappraised).
Senior Assistant Attorney General Elana C. Wills prepared the foregoing opinion, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
MP:ECW/cyh
[1] This power, of course, must be exercised with cognizance of constitutional limitations against the impairment of contracts or vested rights arising before the effective date of any legislative amendments.
[2] Amendment 74 was adopted at the general election on November 5, 1996 and was effective upon adoption, applying to taxes due in 1997 and thereafter. See Publisher's Notes to Amendment 74. Amendment 78 was adopted at the November 7, 2000 general election and was effective January 1, 2001.
[3] Section 13 of Act 716 of 1981 required the Attorney General to institute an action for declaratory judgment to determine the constitutionality of the diversion of tax moneys authorized by the Act.See Publisher's Notes to former A.C.A. § 14-168-201 (Repl. 1998). An action was never commenced due to the lack of a justiciable case or controversy. See Op. Att'y. Gen. 89-264.
[4] See Miller v. Covington Development Authority, et al.,539 S.W.2d 1, 5 (Ky. 1976).
[5] In fact, in most school districts, the passage of Amendment 74 did not have the effect of changing the school districts' millages at all. In those districts with millage rates at or above 25 mills (available for maintenance and operation) at the effective date of Amendment 74, the millage rate did not change. The voters had already voted to "levy" a rate sufficient to comply with Amendment 74. In other districts, Amendment 74 had the effect of raising the locally levied available millage rate to the twenty-five mill rate (available for maintenance and operation). In those districts, only a portion of the twenty-five mills, therefore, might be characterized as "levied" by the State itself.
[6] Section 14-168-312(a)(3) provides for distribution to the "taxing entities."
[7] Debt service millage, of course, is generally excluded from the authorized diversion of funds to support a redevelopment district. See
A.C.A. § 14-168-301(5); A.C.A. § 14-168-312 (a)(1)(C); and A.C.A. §14-168-312 (a)(3)(B). It should be noted in this regard that current law authorizes a school district to include excess debt millage as a part of the twenty-five mill uniform rate of tax. See A.C.A. § 26-80-204(18)(C) (Supp. 2001). It is possible, therefore, in response to your question, that a portion of the uniform rate in a particular school district will be protected from the "TIF" calculation as "debt service."